## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BOBBY JOHNSON,** | : | NO. 3:17-CV-01479-JAM |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF NEW HAVEN; FRANCISCO** | : | |
| **ORTIZ, CLARENCE WILLOUGHBY,** | : | |
| **MICHAEL QUINN, PATRICK** | : | |
| **REDDING, HERMAN BADGER, and** | : | |
| **ANDREW MURO,** | : | **OCTOBER 26, 2017** |
| **Defendants.** | | |

## AMENDED COMPLAINT

Plaintiff Bobby Johnson, by and through his attorneys, states as follows:

## INTRODUCTION

1.      Beginning in late 2006, Plaintiff Bobby Johnson, then only 16 years old was wrongfully arrested, imprisoned, prosecuted and convicted for the murder of Herbert Fields – a crime that he did not commit. Although no physical or forensic evidence ever connected him to the crimes, he was charged and convicted as a result of false evidence that was coerced, fabricated, and covered-up by the detectives and supervisors of the New Haven Police Department ("NHPD") and other agents of the Defendant City of New Haven ("City"), as part of a pervasive and long-standing custom, policy, pattern and practice of "closing" high profile criminal cases at all costs, in knowing and recklessly indifferent disregard of the constitutional rights of Plaintiff and similarly situated victims of that misconduct.

2.      As a result of defendants' actions as pled herein, Plaintiff was wrongfully incarcerated for nine years – the critical years between age 16 and age 25 – separated from his family, and caused

to suffer severe mental anguish, emotional distress, loss of income, loss of past and future earning capacity, humiliation, indignities, injury to reputation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom, including, but not limited to, diet, sleep, personal contact, educational opportunity, athletic opportunity, sexual activity, and personal fulfillment, and loss of life's enjoyment in numerous other respects.

## JURISDICTION AND VENUE

**3.**     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Johnson's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

**4.**     This Court has supplemental jurisdiction over Mr. Johnson's state law claims pursuant to 28 U.S.C. § 1367(a).

**5.**     Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

**6.**     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

**7.**     Plaintiff **BOBBY JOHNSON** is, and at all times relevant to this Complaint was, a resident of the State of Connecticut. On September 15, 2006, Mr. Johnson was taken from his home and wrongfully arrested and imprisoned, and thereafter convicted of murder and sentenced to 38 years of imprisonment. On September 4, 2015, after nine years of wrongful imprisonment,

Mr. Johnson was finally released from prison, after the State itself acknowledged that his conviction lacked integrity, and the Connecticut Superior Court vacated his conviction and dismissed all charges.

8.      Defendant **CITY OF NEW HAVEN** is, and at all times relevant to this Complaint was, a municipality located in the State of Connecticut. The City of New Haven was, at all times relevant to this Complaint, officially responsible for the policies, practices, and customs of the NHPD, and was the employer of the individual NHPD Defendants in this matter. During all times relevant to this Complaint, the City of New Haven delegated policy-making authority regarding the NHPD to the NHPD Chief of Police.

9.      Defendant **FRANCISCO ORTIZ**, at all times relevant to this Complaint, was an employee of the NHPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Ortiz served as the NHPD's Chief of Police from approximately June 2003 to early 2008, when he resigned. The Chief of Police is responsible for setting the policies and practices of the NHPD, and is the final policy-maker for police actions on behalf of the City of New Haven. Ortiz is named in both his individual capacity and his official capacity.

10.      Defendant **CLARENCE WILLOUGHBY**, at all times relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Willoughby was a member of the NHPD for 24 years, retiring in 2008, and a member of the NHPD detective division, known as the Investigative Services Unit ("detective bureau") for the last 17 of those years. As set forth below, he repeatedly engaged in

3

blatantly unconstitutional practices to strong-arm and fabricate witness statements, and conceal exculpatory evidence, in order to quickly close ("get rid of") high-profile criminal cases, and was known in the NHPD for his facility in doing so, boasting a success rate (100%) that was in itself a red flag his colleagues and superiors in the NHPD conveniently ignored.  He was frequently hand-picked by his superiors to investigate and close such cases, including the homicide of Mr. Fields for which Plaintiff was wrongfully arrested and convicted here. Defendant Willoughby is named in his individual capacity.

11.     Defendant **MICHAEL QUINN**, at all times relevant to this Complaint, was a duly appointed and acting officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. During the time in question herein, Defendant Quinn was a member of the NHPD detective bureau, and a frequent partner with Willoughby in the conduct of interrogations and investigations for the NHPD.  Defendant Quinn is named in his individual capacity.

12.     Defendant **PATRICK REDDING**, at all times relevant to this Complaint, was a duly appointed and acting officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Defendant Redding was a member of the NHPD for 27 years, retiring with the rank of Assistant Chief in early 2012. In April 2007 he became the Officer in Charge of the detective bureau. He is named in his individual capacity.

13.     Defendant **HERMAN BADGER**, at all times relevant to this Complaint, was a duly appointed and acting officer of the NHPD acting under color of law and within the scope of

employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. From 2003 until August 1, 2006, Badger was the Officer in Charge of the detective bureau, and thereafter held the position of Assistant Chief.  Badger is named in his individual capacity.

14.      Defendant **ANDREW MURO**, at all times relevant to this Complaint, was a duly appointed and acting officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD.  As of 2006 Sergeant Muro had been a long-time member of the NHPD's detective bureau, and became the Officer in Charge of said detective bureau beginning in August 2006. Muro is named in his individual capacity.

## FACTUAL ALLEGATIONS

15.      On August 1, 2006, Herbert Fields, an elderly resident of West Haven, was shot and killed as he sat in his automobile on West Ivy Street in the Newhallville section of New Haven.

16.      Although forensic evidence had been recovered from the scene, including a 45-caliber spent cartridge and palm prints from the victim's automobile, and the fatal bullet recovered from the victim's body, the NHPD detectives assigned to head the investigation – Defendants Clarence Willoughby and Michael Quinn -- did not wait for the forensic results, or conduct any further substantive investigation following the initial inconclusive witness interviews conducted by other officers in the immediate aftermath of the shooting.

17.      Instead, using an uncorroborated rumor from a highly suspicious source in lieu of any bona fide police work, they turned to Bobby Johnson – a 16-year-old resident of the neighborhood with no history of guns or violence – and to a neighborhood acquaintance of

Plaintiff's, Kwame Wells-Jordan, who happened to be present when they first questioned Plaintiff in his home on August 15, 2006, and proceeded to manufacture evidence against the two of them to quickly close the case and "solve" the Fields murder.

18.     They did so by manufacturing false evidence, utilizing threats, lies, false promises and other misconduct to create statements from vulnerable witnesses, and then -- and only then – preparing sanitized taped statements that they falsely portrayed as the unvarnished truth, when the opposite was the case.

19.     In Plaintiff's case, as in other NHPD cases during the same time frame, Willoughby and Quinn deliberately failed to make any record of this misconduct, which they would thereafter be free to falsely deny.

**Willoughby and Quinn Strong-Arm Plaintiff and his Vulnerable Teenage Associates into Confessing to a Murder None of Them Had Anything to do With**

20.     In the aftermath of the Fields murder, it was reported that one of the two perpetrators was an individual known as "Bo".

21.     Plaintiff had never been known by that nickname.  Nevertheless, Defendant Quinn, to whom the NHPD assigned the investigation, quickly settled on Plaintiff as his primary suspect, following the suggestion of one William Outlaw, then in the custody of the NHPD for another nearby shooting (in which Outlaw's close associate – an individual in the neighborhood well known to the NHPD as Richard "Bo-Bo" Benson -- had also been implicated), that Plaintiff was supposedly known as "Bo" and was rumored to be responsible for Fields murder.

22.     Based on that uncorroborated and highly suspect statement, Quinn went to Plaintiff's home at 54 Willis Street on August 15th, and brought him to the station for questioning. Plaintiff stated that on the day of the shooting he had been at the neighborhood pharmacy, at the

corner of Dixwell Avenue and Bassett Street, north of the crime scene, when he heard sirens and went briefly to the scene, where he observed the investigation in progress, but had no involvement in the shooting.

23.     The following day Quinn brought Plaintiff's friend, Wells-Jordan (14 years old) to the station for questioning, and Wells-Jordan likewise indicated no involvement.

24.     Within two weeks, without conducting any further investigation and with no further evidence whatsoever to support it, the NHPD proceeded to extract a "confession" from Plaintiff.

25.     In a further session on September 3rd, Defendants Quinn and Willoughby did so through lies, threats and intimidation: they told Plaintiff his fingerprints had been found on the victim's car, which they knew was false; they told him "everyone" was going against him, which was likewise false; they told him that, contrary to his previous account of having been at the neighborhood pharmacy,  a supposed video recording from the pharmacy showed that he was not present – another lie; they claimed to be working with his grandfather to help him out, and that if he ever wanted to see his family again he needed to give them a confession; and they told him that unless he did as they told him and  confessed, he would face the death penalty, but that if he complied they would see to it he received only probation.

26.     Defendants Quinn and Willoughby then proceeded to feed Plaintiff information about the murder for use in the taped confession they would thereafter record, showing him pictures of the victim and his vehicle and feeding him other details so that he could include them in the manufactured account they would subsequently record, to make it appear that Plaintiff had first-hand knowledge, when they knew he did not. Plaintiff, with an IQ of 69, with no prior

experience with police interrogation, and with no access to his mother or any other family members, acceded to their demands.

27.     Defendants Quinn and Willoughby then took a 12-minute taped statement – the only record they preserved.  In that taped statement, as instructed, Plaintiff confessed to the murder, naming his cousin, Michael Holmes, as the second perpetrator and source of the gun, and stating that the shooting occurred as the result of an altercation between Holmes and the victim.

28.     Pursuant to established NHPD policy and practice, Quinn and Willoughby never documented any of this misconduct, or any aspect of the lengthy interrogation preceding the false taped statement they obtained, as intended, at the very end of the session.

29.     With Plaintiff's confession in hand, two days later (September 5th) Defendants Willoughby and Quinn brought Holmes (16 years old) to the station.  After Holmes likewise denied any knowledge of the murder, Willoughby and Quinn  engaged in similar pre-tape intimidation with Holmes, to obtain an incriminating, and wholly false, statement from him as well, which included: the identification of Wells-Jordan (who Holmes did not know) as a third participant (in contrast to the numerous eyewitness reports of two males only); a pre-shooting course of travel in which the three of them (Plaintiff, Holmes and Wells-Jordan) supposedly walked from the corner of Bassett Street and Dixwell Avenue, to Plaintiff's home on Willis Street, waited while Plaintiff momentarily entered the house, and then supposedly proceeded together to nearby West Ivy Street; a scenario in which Plaintiff, not Holmes, became involved in an altercation with the victim, while Holmes was supposedly engaged in a conversation with an eyewitness across the street – a witness who had been interviewed by an officer at the scene, and who reported no such conversation, and no observation of Holmes or any third male; the

8

claim that when Holmes approached the vehicle, and the victim "grabbed" Holmes, Plaintiff shot the victim using his own gun (not one provided by Holmes, as in Plaintiff's September 3rd statement, or by Larry Mabery, as in Plaintiff's September 15th "corrected" statement, *see* ¶¶ 38-39, *infra*), and a course of flight, tracking the September 3rd statement procured from Plaintiff, but the opposite of that observed by all eyewitnesses.

**30.**     On September 6th, Quinn and Willoughby brought Wells-Jordan (14 years old) to the station, in the company of his aunt and guardian, Julia Sykes, utilizing the same tactics to cause Wells-Jordan to "break down and beg[i]n to cry." Sykes, a mature school teacher, described Willoughby's tactics, falsely insisting (as with Plaintiff three days before) that Wells-Jordan's fingerprints were on the victim's car, and physically and verbally intimidating Wells-Jordan when he denied it. Although unsuccessful at that time -- after an hour, Wells-Jordan and Sykes terminated the session and left the station – as set forth below, when the detectives thereafter arrested Wells-Jordan and charged him with murder as well, he ultimately likewise acceded to the strong-arm tactics of Quinn and Willoughby, and an unidentified NHPD supervisor they called into the interrogation room to reinforce their unconstitutional pattern of lies, concealment, threats and manipulation to manufacture evidence and achieve case closure at all costs.

**The Mabery Ballistic Results, Benson's Palm Print, and the "Corrected" Confession**

**31.**     Notwithstanding Wells-Jordan's persistent denials, and the incompatibilities of the statements procured from Plaintiff and Holmes with one another, with the physical evidence, and with the eyewitness reports, the detectives had already decided to arrest Plaintiff, and "clear" the case.

32.     Before they were able to do so, however, on September 15th, the NHPD was notified by the Connecticut State Police lab of ballistics results revealing that a 45-caliber pistol recovered from the body of Larry Mabery in a shootout on August 30, 2006, just weeks *after* the Fields murder, had been positively matched to the single shell casing and projectile involved in the Fields murder on August 1st.

33.     As of that time, the NHPD was aware that Mabery had committed two other murders in close proximity to the Fields murder: (i) the July 12, 2006 murder of Domingo Rodriguez, committed just 18 days *before* the Fields murder (NHPD file no. CN 06-40420), and (ii) the June 14, 2006 murder of Samuel Mallory just weeks before that, in the same Newhallville neighborhood and within blocks of the location at which Herbert Fields had been murdered (NHPD file no. CN 06-34114), as set forth in NHPD police records that were never disclosed to Plaintiff or his counsel at the time of his prosecution or for years thereafter.

34.     Both of those murders, as with the Fields murder, involved the discharge of the gun at point blank range into the head of the victim; both of those murders, as with the Fields murder, were committed in a cold-blooded, pre-meditated fashion, without any provocation; and both of those murders were committed with a .45-caliber semi-automatic pistol – in the case of August 1st Fields murder and the July 12th Rodriguez murder (and likely in the case of the June 12th Malory murder), with the identically same, ballistically matched 45-caliber gun recovered from the body of Larry Mabery on August 30th.

35.     In fact, as set forth in NHPD records finally obtained in August 2015, shortly before Plaintiff's exoneration, but suppressed until that date by the NHPD and the City of New Haven (*see* ¶ 83, *infra*), Quinn himself had a role in the investigation of Mabery's June 14th Mallory

10

murder, taking a statement from a witness on August 16, 2006 who positively identified Mabery as the perpetrator and described Mabery's point blank shooting of the victim in the head, including Mabery's stooping over the victim and continuing to fire shots into his head as he lay dying.

36.     Moreover, as set forth in NHPD records likewise suppressed for years, Detective Willoughby himself (the other member of the NHPD interrogation team that had manufactured the false statements of Holmes and Wells-Jordan, and the false confessions of Plaintiff) was directly involved in the investigation of Mabery's July 12th Rodriguez murder, including Willoughby's police interview of Mabery on July 23, 2006 – barely one week before the Fields murder – in which Mabery admitted he had been inside Rodriguez's car immediately before the shots rang out, in the precise location from which Rodriguez was repeatedly shot in the head at point blank range with the same .45-caliber semi-automatic used to murder Fields two and a half weeks later.

37.      At the time the NHPD received notice of the foregoing ballistics evidence, linking the Fields murder weapon directly to Mabery and his pattern of virtually identical murders in the weeks leading up to the Fields shooting, the NHPD was already locked into its fabricated case against Plaintiff and Wells-Jordan, and accordingly did nothing to pursue that evidence.

38.     Instead, on the same date the NHPD received the State ballistics report (which put the lie to the statements already coerced from Plaintiff and Holmes), Quinn and Willoughby proceeded to immediately take Plaintiff into custody and to manufacture yet a further false statement to reconcile their fabricated case against Plaintiff with the new evidence showing Mabery in possession of the Fields murder weapon both shortly *before and after* it was used to shoot Fields.

11

39.     Utilizing the same tactics of intimidation, lies, threats and false promises, the detectives

dictated  a "corrected" confession for Plaintiff to parrot back, to now say he had obtained the gun

from Mabery, not Holmes; that, contrary to the previous police-dictated statements of Holmes

and Plaintiff (and contrary to the later "confession" the NHPD strong-armed from Wells-Jordan),

the three of them had actually gone far out of their way, many blocks south on Dixwell Avenue,

to Mabery's apartment; that the three of them told Mabery (whose name appears in none of the

other taped statements) that they "wanna rob someone"; that Mabery willingly turned over "the

gun"; that Plaintiff, Holmes and Wells-Jordan then walked together back up Dixwell to the

vicinity of the murder; and that they thereafter proceeded to the murder scene to rob "anybody

that came by."

40.     On October 5, 2006, a short time after the ballistics report pointing to Mabery in

connection with the Fields murder, yet additional forensic evidence was reported to the NHPD,

reinforcing the evidence of Mabery's involvement in the Fields murder and exculpating Plaintiff.

On that date the NHPD Bureau of Identification reported the positive match of a latent print

taken from the victim's car on August 1, 2006 – "LP-1", from the exterior of the front passenger

door – with the right-hand palm of Richard Benson, "to the exclusion of all others."

41.     As Plaintiff thereafter sought to show at his 2012 State habeas corpus trial, the New

Haven police were well aware that Benson was commonly referred to by the nickname "Bo-Bo",

as reflected in numerous NHPD reports of his criminal activity in the Newhallville

neighborhood, and likewise aware that Benson was closely associated with Mabery, living

together with Mabery at 573 Dixwell, apt. # 18 -- two blocks south of the Fields murder scene,

on the street and in the direction the perpetrators had fled.  And, as the NHPD was also well

aware, Benson, like his cousin and roommate Mabery, had exhibited a proclivity for guns, violence and brutality that belied his young age.

42.     By the time the print on the victim's car had been matched to "Bo-Bo" Benson, however, Plaintiff's case was already closed as far as the NHPD and the Defendants herein were concerned, and they had no interest in reopening the investigation, exposing the improprieties utilized to close the case, or rectifying that unconstitutional misconduct and the wrongful arrest and incarceration of Plaintiff resulting therefrom.  Instead, they had every interest in ignoring the evidence pointing to Mabery and Benson, and the misconduct to which they had subjected Plaintiff, Holmes and Wells-Jordan, which is exactly what they did and continued to do for years thereafter, while Plaintiff continued to languish in prison.

**Defendants Strong-Arm Yet Another False Confession**

43.     As set forth above, in Defendants Quinn and Willoughby's first round of coercive interrogations, although successful with Plaintiff on September 3rd and 15th, and with Holmes on September 5th – teenage subjects who were overwhelmed and without the presence of any guardian or support, in coercive sessions of which the defendants were careful, in accordance with the NHPD's long history, to avoid leaving any record or trail of their wrongdoing -- had been unsuccessful in attempting to force a confession from Wells-Jordan..

44.     Undaunted, in order to maintain the manufactured and already closed case against Plaintiff, and notwithstanding the aforesaid evidence pointing to Mabery and Benson, on November 9, 2006 the NHPD took Wells-Jordan into custody, as Plaintiff's supposed accomplice in the Fields murder, and Quinn and Willoughby proceeded to conduct another

session of lies and intimidation to ultimately extract a "corroborating" confession in support of the case closure they were determined to preserve at all costs.

45.     In that interrogation session, with the assistance and complicity of a NHPD supervisor who participated in part of the questioning, and reiterated the knowingly false claim that Wells-Jordan's fingerprints had been found on the victim's car, and utilizing tactics similar to those used with Plaintiff and Holmes set forth above, but in this instance with the presence of Wells-Jordan's aunt, Julia Sykes, Defendants Quinn and Willoughby read out their own account of what they "wanted [Wells-Jordan] to say" – the police script of "where they were, where they met up," "explain[ing] all of that to [Wells-Jordan], read[ing] off of a piece of paper."

46.     When Sykes asked for a lawyer, Willoughby told her she did not need one, and continued to pressure Wells-Jordan for a confession, with the same insistence that he had to "make [him]self a witness," citing the example of Holmes.

47.     Faced with pressure that even Sykes could no longer withstand, she ultimately told her nephew to give the detectives what they were demanding, and the tape recorder was then (only then) turned on, and a "corroborating" confession orchestrated – thereafter falsely portrayed at Wells-Jordan's trial as the product of unvarnished voluntariness, in the perjured testimony of Detective Quinn.

48.     Of course, none of the actions portrayed in the statement of Wells-Jordan, as with the previous police statements of Plaintiff and Holmes, were true. Wells-Jordan did not actually witness any of the events discussed in his statement because they never happened. Wells-Jordan described events to track those of Plaintiff and Holmes's false statements only because Willoughby and Quinn strong-armed "confessions" from each of them.

14

49.     When Plaintiff and Holmes were thereafter called, as prosecution witnesses, at the trial of Wells-Jordan, both of them -- unrepresented by counsel and with nothing to gain -- renounced those statements in their entirety, and independently confirmed the NHPD misconduct that had been utilized to procure them.

**The NHPD Fabrication of Yet Additional False Evidence of Plaintiff's Purported Guilt**

50.     As part of an ongoing "joke" in the NHPD detective bureau during the time period in question, Defendants Quinn and Willoughby, with the knowledge of senior supervisory personnel, engaged in the fabrication of police documents in pending felony investigations, concocting supposed confidential informant evidence that did not exist.

51.     The Fields homicide investigation was one among many such cases.

52.     On August 11, 2006, Defendant Quinn, the lead detective in the Fields investigation and the officer signing the warrant for Plaintiff's arrest, submitted an "Informant Payment Request" on NHPD letterhead, in order to obtain reimbursement for funds purportedly "paid [to an informant] for providing this Detective [Quinn] the name of a suspect that shot and killed a man on West Ivy Street on August 1, 2006," which, according to Quinn, had already resulted in the "arrest of . . . Bobby Johnson for the murder of Herbert Fields."  In addition to the signature of Detective Quinn, the form bore the requisite "supervisor approv[al]", with the signature of Lieutenant William White.  That NHPD police document, created by Quinn, and signed off by Lieutenant White, was completely false.  There had been no confidential informant in the Fields investigation, and, as of August 11th, Plaintiff had not yet been questioned let alone arrested.

53.     Lieutenant White, who had a long history of alleged and proven misconduct, including the fabrication of evidence himself by planting drugs on victims and then arresting them (a case

in which White pointed a gun at the heads of several schoolchildren who were not under arrest and yelled: "The first n***** who moves will get his fucking head blown off"). In that case, a NHPD investigation of the incident had concluded White had lied in his reports and subsequent testimony. Yet, then-NHPD Chief of Police Farrell chose to take no action beyond reprimand, and, by the time of the Fields investigation, White had been promoted and rewarded with a senior position in the NHPD narcotics bureau. From that senior NHPD position, during the very time of the Fields investigation, and White's supervisory approval of fabricated CI vouchers for both Quinn, *see* ¶ 52, *supra*, and Willoughby, *see* ¶¶ 54-56, *infra*, Lieutenant White also oversaw a massive scheme of bribery and misappropriation of tens of thousands of dollars in bail bondsman funds, involving White and other NHPD officers, and ultimately exposed -- not by the NHPD, but by the outside intervention of the FBI.

**54.**     Like his partner (Detective Quinn), Defendant Willoughby likewise prepared, signed and submitted "informant" payment vouchers with respect to purported confidential informants that Willoughby falsely claimed to have provided incriminating information, in order to misappropriate CI funds for his own benefit, including vouchers submitted in the Fields and Rodriguez murder investigations referred to above, on documents likewise verified and/or approved not only by NHPD Lieutenant White, but also by NHPD Sergeant Andrew Muro (the head of detectives), and by the predecessor Officer in Charge of detectives, Herman Badger, who was by then one of the two NHPD Assistant Chiefs of Police. When questioned as part of an Internal Affairs Investigation thereafter, Badger indicated that Police Chief Ortiz himself had been made aware of, and had approved, at least one such fabricated Willoughby request for funds.

55.    As early as April 2007, the senior command of the NHPD, including Defendant Patrick

Redding, who assumed command of the detective bureau following Muro's retirement, was on

notice of the fabrication of police documents by Willoughby concerning CI payments – police

documents signed off by Lt. White, Sgt. Muro, and Assistant Chief Badger, and approved by

Chief Ortiz -- but failed to make timely disclosure of that to Plaintiff, or to the subjects of the

other contemporaneous cases involving Willoughby.  On the contrary, as indicated in the NHPD

internal affairs report prepared more than a year thereafter, although Redding was apprised of

Willoughby's misconduct in early 2007, he declined to take any corrective action for a long

period of time so as to "save" the NHPD case clearances and prosecutions in question.

56.    Similarly, as noted above, the NHPD failed to take any steps to oversee, disclose or

rectify the misconduct of Quinn and Willoughby in connection with Plaintiff's case, including

the police misconduct in manufacturing evidence to falsely implicate Plaintiff, and in failing to

disclose evidence pointing to the true perpetrators, as set forth above.

**The Quinn-Willoughby-Sutton Team's 100% Solve Rate, and the NHPD's Pattern, Policy
and Practice of Coercing and Fabricating Witness Statements, and Concealing Exculpatory
Information with Respect Thereto**

57.    It was no accident that Defendants Willoughby and Quinn were called on to lead this

investigation. They, along with fellow Detective Reginald Sutton, were part of a self-described

"team" that prided itself on a 100% solve rate in quickly closing murder investigations, in a year

in which the New Haven murder rate had increased significantly. Willoughby, in particular, had

a reputation within the NHPD for being able to obtain incriminating evidence – in reality, that

was because he was willing to conduct illegal interrogations, conceal evidence of his illegal

tactics, and otherwise ignore constitutional limits on police investigations, in collusion with

fellow detectives, and enabled by long-standing NHPD policies and practices that condoned and promoted the utilization and concealment of unconstitutional misconduct in the procurement of witness statements and confessions such as that utilized in Plaintiff's case.  NHPD supervisors, including but not limited to Sgt. Muro, knew or should have known that Willoughby's reputation was built directly on his history of unconstitutional misconduct in interrogations, not on quality police work. But these supervisors, including Sgt. Muro in this case, continued to bring Willoughby in to conduct important investigations, and, knowing the risk to suspects' and witnesses' constitutional rights, failed to appropriately supervise him.

58.     Defendant Muro, the head of the NHPD detective bureau, specifically called Willoughby back from vacation to become involved in the Fields homicide investigation because of his reputation for quickly disposing of such cases, and Willoughby claimed that the police chief himself (Defendant Ortiz) called on him to take over other murder investigations for the same reason during the same time period.

59.     As further noted above, in addition to Willoughby and Quinn's coercive and unconstitutional actions in fabricating evidence and creating false statements from Plaintiff, they engaged in a pattern of identical misconduct in their interrogations of Holmes and Wells-Jordan in this very case.

60.     Upon information and belief, much of that misconduct occurred in open view of their supervisors and other senior detectives within the NHPD.  For example, in connection with the interrogation of Plaintiff's co-defendant, Wells-Jordan, on November 9, 2006, in the course of the Willoughby-Quinn brow-beating, threats and lies used to extract Wells-Jordan's false confession, Willoughby and Quinn called in a NHPD "supervisor", who repeated Willoughby

18

and Quinn's knowingly false statement that Wells-Jordan's fingerprints were on the victim's car ("we already got Kwame's fingerprints, [so] you might as well make it better on him") – a perversion of the truth further compounded by the fact that the NHPD's own bureau of identification had, by that time, conclusively determined that the only known prints tied to the victim's car were those of Benson, *see* ¶¶ 40-42, *supra*, but never pursued by any member of the department, because they shared the interest of Quinn and Willoughby in upholding the closure of the case regardless of the evidence, and regardless of the unconstitutional misconduct in achieving it.

61.    During this same time period, Willoughby and NHPD Detective Reginald Sutton, the other member of the NHPD detective "team" of one hundred percenters, utilized identical unconstitutional tactics to induce similarly fabricated statements from other vulnerable witnesses to quickly "close" other contemporaneous New Haven murder cases.

62.    Thus, in the December 24, 2006 shooting of Tony Howell, Willoughby and Sutton precipitously settled on Ernest Pagan as their target within days of the murder, and proceeded to coerce false statements from a series of witnesses who had been in the area, but had no knowledge of Pagan's purported involvement.  As in the Fields murder investigation, Willoughby and his partner used lengthy off-tape sessions to pressure and badger the witnesses to implicate Pagan regardless of their insistence that they had no such information, keeping no record of the unconstitutional conduct through which they manufactured the incriminating statements these tactics were designed to produce, and then, and only then, turning on the recorder to create a sanitized and supposedly unprompted account that they could thereafter lie about in court.

19

**63.**     As with the independent testimony of Holmes, Plaintiff and Sykes at the Wells-Jordan

trial, the witnesses in the Pagan case likewise each independently recounted the same pattern of

coercion and misrepresentations through which these NHPD detectives compelled fabricated

taped statements.  Although Pagan was ultimately acquitted, it was only after he was forced to

endure more than a year in prison. *See Pagan v. Willoughby et al*, Case No. 3:10-cv-155 (JBA).

**64.**     The *Pagan* complaint summarizes the pattern of unconstitutional tactics utilized by the

City of New Haven and the NHPD in this respect, as follows:

> ➢ WILLOUGHBY and SUTTON'S conduct in their investigation of the [Howell]
> shooting was part of an extreme and pervasive pattern of behavior prominently
> featuring coercion and coaching of witnesses, manufacturing evidence, coercing
> suspects, falsifying arrest warrant affidavits, ignoring exculpatory evidence, and
> refusing to engage in basic, standard investigative police work.
> ➢ The same week that a jury acquitted [Pagan] in March 2008, a New Haven
> Superior Court judge granted a defense motion to dismiss a charge of first degree
> manslaughter with a firearm against Errie McClendon. WILLOUGHBY had also
> been the lead investigator on that case, and witnesses said that WILLOUGHBY
> prompted them to make false statements implicating the defendant.
> ➢ Two months after the plaintiff was acquitted, a New Haven Superior Court jury
> acquitted Kwame Wells-Jordan of all charges related to the shooting death of
> Herbert Fields in New Haven - a case also investigated by WILLOUGHBY, this
> time in partnership with then-detective Michael Quinn.
> ➢ Three different witnesses at Wells-Jordan's trial provided sworn testimony that
> WILLOUGHBY and Quinn engaged in a virtually identical pattern of coercive
> misconduct as that alleged in this complaint, including interrogation tricks,
> prolonged pressure and psychological coercion designed to make a person willing
> to say or do anything to make it stop.
> ➢ At Wells-Jordan's trial, then-detective Quinn admitted that he and other New
> Haven police detectives were trained in such interrogation tactics and that they are
> standard practice in the detective division of the New Haven Police Department.
> ➢ In light of the training that WILLOUGHBY and SUTTON and other detectives
> received and the extreme and pervasive pattern of misconduct by WILLOUGHBY,
> SUTTON and other New Haven detectives, the defendant CITY OF NEW HAVEN
> knew or should have known that WILLOUGHBY and SUTTON were using coercive
> interrogation tactics on witnesses and suspects and thereby fabricating evidence that
> would be used in subsequent prosecutions.
> ➢ The Defendant CITY OF NEW HAVEN failed to provide corrective training to

WILLOUGHBY and SUTTON with respect to their interrogation tactics in order to guard against the risk of false confessions and statements.

➢ The Defendant CITY OF NEW HAVEN failed to provide supervision to WILLOUGHBY and SUTTON with respect to their interrogation tactics to guard against the risk of false confessions and statements.

➢ By formally and informally training police officers in coercive interrogation techniques, overtly and tacitly approving their use, and failing to appropriately train and supervise police officers with respect to the interrogation of witnesses and suspects, the defendant CITY OF NEW HAVEN manifested its unwritten policy of supporting coercive interrogations and acted with deliberate indifference to the risk that interrogations by WILLOUGHBY and SUTTON and other New Haven police officers would produce false confessions, coerced statements, fabricated evidence, unlawful prosecutions, and wrongful convictions, all in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

**65.**    The NHPD's and Chief Ortiz's failure to supervise the Willoughby-Quinn-Sutton team in the cases of Plaintiff, Wells-Jordan, Ernest Pagan and Errie McClendon, or to rectify any of that misconduct, are just some of the examples of the NHPD's pattern of unconstitutional actions.  In fact, upon information and belief, Willoughby, Quinn and Sutton were far from the only NHPD officers and detectives who engaged in such unconstitutional conduct, and who were not adequately supervised or disciplined.  There was a long history of neglect and reckless indifference to such misconduct.

**66.**    In 1982, a federal jury found NHPD officer Mel Cartoceti liable for using excessive force in the arrest of 33-year-old postal employee Donald Dinkins. Cartoceti and another officer maced Mr. Dinkins in the face and repeatedly beat him. The jury also concluded that Cartoceti "knowingly and deliberately filed a false report" under penalty of perjury. Although Internal Affairs nominally investigated this incident, it cleared Cartoceti of any wrongdoing (as they had done after numerous other complaints). Rather than disciplining Cartoceti, the NHPD promoted him to detective. NHPD Chief of Police William Farrell publicly commented that he was satisfied with Internal Affairs' response.

**67.**    In July 1984, Detective Anthony DiLullo was named as a defendant in a malicious

prosecution lawsuit. At trial, DiLullo admitted to misquoting statements people gave him on the

arrest warrant and to leaving out the fact that one witness, the parking garage attendant,

identified someone completely different as the killer.

**68.**    In August 1991, Eric Ham brought a federal civil rights action against NHPD Detectives

Joseph Greene and Michael Sweeney claiming false arrest and malicious prosecution. Mr. Ham,

who had been arrested on February 13, 1991 for a January 20, 1991 murder, alleged that Greene

and Sweeney knowingly made misleading statements on and omitted material information from

their affidavit in order to obtain the arrest warrant. In particular, Greene and Sweeney failed to

disclose that a key witness mentioned throughout the affidavit made two prior statements in

which he did not identify Mr. Ham as the assailant. A jury returned a verdict in favor of Mr.

Ham, awarding nearly $1,000,000 in damages. *See Ham v. Greene*, 248 Conn. 508, 729 A.2d 740

(1999).

**69.**    On May 8, 1990, Terrance Gamble was shot and killed. His murder was investigated by

the NHPD, including by Detectives Anthony DiLullo and Joe Greene. Two days after the murder,

Detectives DiLullo and Greene obtained a tape-recorded a statement from a witness implicating

Maceo Streater. The next week, the witness met with the detectives to read and review her

statement, signing the last page. At Mr. Streater's trial, the witness swore that DiLullo and

Greene coerced her into providing the statement. She testified that the police were "chasing after

her" following the incident, and that Detective Green had come to her house several times. She

also said that he had stopped the tape several times during her statement to tell her what to say,

and that the statement was not true. The Court did not allow Mr. Streater's counsel to question

DiLullo regarding the fact that he was a defendant in three pending federal civil rights actions that included allegations of coercion and intimidation.

**70.**     On October 11, 1991, former New Haven alderman Ricardo Turner, and his live-in companion, Lamont Fields, were shot and killed in side their apartment on Howard Avenue in New Haven.  Upon assuming control over the investigation in January 1991, NHPD Detective Vincent Raucci proceeded to immediately "solve" the case through the procurement of taped statements from three vulnerable witnesses who had no ostensible connection to the case – in a pattern identical to that used by Willoughby and Quinn in plaintiff's case: lengthy pre-tape interrogation sessions in which no record was made of the unconstitutional process by which the NHPD officers threatened and lied to the witnesses and fed them the information they were thereafter led to record on sanitized taped statement at the conclusion of each session, and then presented as the supposedly un-coached product of bona fide eyewitness observations, when the opposite was case.

**71.**     As revealed in a subsequent FBI investigation of Raucci's conduct in that case, in which every one of the witnesses from whom Raucci and other NHPD detectives had procured taped statements, and thereafter recanted their respective statements in their entirety sworn statements to the FBI, described an identical pattern of similar NHPD misconduct and pre-tape police prevarication.  In addition, as further revealed by the FBI investigation, Detective Raucci, who had been a long-time member of the NHPD narcotics squad prior to his elevation to the detective bureau, like Lieutenant White (per yet another FBI investigation of the department around the time of Plaintiff's arrest), was in the frequent practice of utilizing his police prerogatives to

misappropriate public funds and engage in widespread criminal misconduct, of which his superiors were or should have been aware, but did nothing to rectify.

**72.**     The targets of the unconstitutional conduct of Raucci and his NHPD colleagues with respect to the Turner-Fields investigation (Scott Lewis and Stefon Morant) remained incarcerated at the time of Plaintiff's arrest herein, and – again as in Plaintiff's case – the NHPD and the City did nothing to address the by-then acknowledged police misconduct surrounding their arrest and conviction, just as they did nothing *for years* to address the injustice of Plaintiff's continuing incarceration and the NHPD misconduct in bringing it about.   The unconstitutional polices, pattern and practices of the NHPD and City of New Haven surrounding the Turner-Fields investigation is the subject of a currently pending civil rights action in this District brought on behalf of Lewis, *see Lewis v. City of New Haven et al*, Case No. 3:16-cv-01382 (SRU), in which the City has agreed to a pay a settlement of $9,500,000.

**73.**     On September 21, 1991, two individuals were murdered outside of a New Haven diner. In 1994, Daryl Valentine was convicted for those murders based on the investigation of NHPD Detectives Joe Greene and Anthony DiLullo. Mr. Valentine has consistently maintained his innocence.  At trial, two witnesses testified that they were coerced and bribed by Detective Greene into making written and tape-recorded statements against Mr. Valentine.  One witness testified that she had been induced by the NHPD to provide an inculpatory tape-recorded statement against Valentine that was false, that Detective Greene had threatened her with jail time in order to elicit her statement, and that after she provided the taped statement that she renounced at trial, Detective Greene bought her alcohol and cigarettes and gave her money to buy cocaine.  Another witness testified that she told Detective Greene that she was not present at

the diner during the shooting, and that she ultimately capitulated into giving a false inculpatory statement under pressure and bribes from Detective Greene.

74.     Upon information and belief, the NHPD did nothing to administer discipline or conduct any review, training or revision with respect to the to the investigative practices, disclosure obligations and record-keeping surrounding the procurement of witness statements in the Valentine, Lewis-Morant or any other of the foregoing cases.

75.     From approximately 1986 through his resignation in 1993, NHPD Officer Vincent Riccio had 14 complaints filed against him. None of these 14 complaints resulted in any official disciplinary action. In fact, in just seven years, Riccio was promoted to Sergeant and selected to pioneer then-Chief Pastore's community-based policing program.

76.     In 1996, Philip Cusick was shot to death in New Haven's Fair Haven neighborhood, allegedly by a drug dealer. The NHPD reported that they had no reason to believe Cusick was involved in a drug transaction. In 1998, NHPD detectives taped an interview of a Fair Haven gang member who said that he witnessed the murder and identified a fellow drug dealer as the murderer. A NHPD supervisor kept a transcript of the interview in his desk drawer and the tape disappeared. The NHPD never notified North Haven Police, who were also investigating the case, about the interview, and the NHPD never interview or pursued the killer.

    **a.**   Two years later NHPD launched its own internal investigation, implicating Captain Brian Sullivan, the NHPD's chief of detectives, and his deputy, Ed Kendall. Sullivan claimed that Chief Mel Wearing told him to stop the investigation for budgetary reasons.

25

    **b.**   Sullivan was eventually arrested on charges of hiding the statement and hindering the investigation. The NHPD's Internal Affairs report also noted that Chief Wearing overruled his own internal affairs investigators in their efforts to obtain "untainted testimony," and that although Kendall took actions that could easily be interpreted as tampering with a witness, Wearing did nothing when he learned of what Kendall did.

**77.**    As noted above, NHPD Officer William White, who already had a long history of alleged and proven misconduct, and had received a reprimand for "conduct unbecoming of an officer" and "failing to satisfactorily perform the tasks of an officer," including the planting of drugs on victims and then arresting them, was found to have lied in his reports and subsequent testimony, but subject to no significant disciplinary action.  On the contrary, he was thereafter promoted to himself head the Criminal Intelligence Section of the NHPD.  White remained active in the NHPD until approximately 2007, when he was arrested by the FBI in connection with illegal activities while a member of the NHPD's Narcotics Enforcement Unit, and eventually pled guilty to corruption related charges.  As noted above, it was Lieutenant White who signed off on the forged vouchers submitted by Detectives Quinn and Willoughby in the Plaintiff's case, with the further participation of Sgt. Muro and apparent knowledge of Assistant Chief Badger and Chief Ortiz in connection with Willoughby's similar forgeries in related contemporaneous NHPD murder investigations.

**78.**    In June 2005, a person was shot and killed on Canal Street in New Haven.  J'Viel Outing was subsequently arrested based on the NHPD taped statements of two witnesses, Nadine Crimley and Ray Caple, both whom later recanted those statements, testifying that the NHPD had pressured into making those false statements.  Once again, there had been pre-tape sessions,

26

during which the police misconduct occurred, and once again there was no record made or available of those pre-tape police sessions.

79.     In addition to the cases discussed above, the NHPD also exhibited a long-standing pattern of failing to maintain witness 911 taped statements, similar to the practice and policy of failing to preserve any record of the off-tape sessions and misconduct in witness interrogations as in this case, the Pagan case, the McClendon case, and numerous other NHPD cases -- a pattern of conduct for which the NHPD had been repeatedly reprimanded by the courts, and which the NHPD knew would render it impossible to comply with its obligations to disclose exculpatory evidence in major criminal cases.

80.     Upon information and belief, the long-standing practice and policy of the NHPD in failing to maintain or disclose records of pre-tape interviews was permitted, encouraged and ratified by the NHPD in order to facilitate its closure of cases and to bolster the ability to overcome defense challenges by virtue of the rule in *State v. Whelan*, 200 Conn. 743 (1986), holding that taped police statements were a sufficient substitute for live testimony in securing convictions, and thereby ensuring that closed cases were permanently cleared.  Indeed, the prosecution of Plaintiff's co-defendant, Wells-Jordan, was premised on such "*Whelan*" statements, and in particular that of Plaintiff here himself, with the New Haven-based prosecutor in that case at one point gloating that he had procured "at least" eight other guilty verdicts in murder cases on the basis of out of court *Whelan* statements alone.

81.     The utilization of the aforesaid NHPD practice and policy in the Fields murder investigation was the direct and proximate cause of plaintiff's arrest, incarceration and conviction, and the ensuing damages.

27

**After nearly a decade of incarceration, Plaintiff is exonerated and released**

**82.**     In late 2010, Plaintiff brought a habeas corpus petition, and developed evidence of his innocence and the misconduct that had been utilized by the Defendants Willoughby and Quinn, and the NHPD, in connection with his arrest, prosecution and conviction.

**83.**     As part of that proceeding, Plaintiff sought to obtain the suppressed records of Mabery's other murders, in close proximity to the Fields murder, with the same murder weapon, in support of Plaintiff's claim of due process violations for unconstitutional suppression of exculpatory evidence.  Even then, the City and its corporation counsel resisted the disclosure of that evidence, and, at its behest, Plaintiff's subpoena for those records was quashed.

**84.**     In the course of an appeal of Plaintiff's habeas case, to its credit, the Office of the Chief State's Attorney agreed that Plaintiff was entitled to disclosure of such evidence, and thereafter agreed to reinvestigate plaintiff's conviction, and, in conjunction with the New Haven State's Attorney, commendably agreed that Plaintiff's conviction should be set aside.

**85.**     Accordingly, on September 4, 2015, the New Haven Superior Court vacated Plaintiff's conviction, the charges were dismissed, and Plaintiff was released from prison after serving nine years for a crime he did not commit, and should never have been charged with.

## DAMAGES

**86.**     The unlawful, intentional, recklessly indifferent, negligent and/or bad-faith acts and omissions of the Individual Defendants and the City of New Haven caused Plaintiff to be falsely arrested and imprisoned, wrongfully convicted, and forced to serve nine years in prison for a brutal crime he did not commit.

**87.**     As a direct result of Defendants' aforesaid acts and omissions, Plaintiff sustained injuries

28

and damages, including loss of his freedom for nine years, loss of his youth, pain and suffering, severe mental anguish, emotional distress, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

88.     As a further result of Defendants' aforesaid acts and omissions, Plaintiff was also deprived of his familial relationships.

89.     As a further result of aforesaid acts and omissions, Plaintiff sustained economic injuries and damages, including loss of income and loss of career opportunities.

90.     As a further result of Defendants' aforesaid acts and omissions, Plaintiff sustained physical injuries and damages, including physical pain and suffering, personal injuries and physical illness, for which he is entitled to monetary relief.

## **FEDERAL CLAIMS**

### **COUNT I**
**42 USC § 1983 Creation of False Evidence in Violation of the Fourteenth Amendment**

*Against Defendants Willoughby and Quinn*

91.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

92.     Defendants Willoughby and Quinn, acting individually and in concert, and within the scope of their employment with the NHPD, fabricated the false confessions and false statements of Plaintiff, Holmes and Wells-Jordan, as set forth above, and thereby deprived Plaintiff of his clearly established constitutional rights to due process of law and to fair pretrial and trial

29

proceedings.

**93.**     Defendants Willoughby and Quinn caused the foregoing fabricated evidence to be forwarded to the prosecution for use in Plaintiff's case, knowing and intending that said false evidence would influence Plaintiff's prosecution for the Fields murder and would corrupt the truth-seeking function of pretrial and trial proceedings associated therewith.

**94.**     These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No reasonable officer in 2006 or 2007 would have believed this conduct was lawful.

**95.**     The foregoing police-fabricated evidence was utilized in Plaintiff's prosecution, and was a material factor in, and cause of, his prosecution, conviction and incarceration, in violation of his Fourteenth Amendment rights not to be deprived of liberty without due process.

<u>**COUNT II**</u>

<u>**42 USC § 1983 Coerced Confessions in Violation of the Fifth and Fourteenth Amendments**</u>

***Against Defendants Willoughby and Quinn***

**96.**     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

**97.**     Defendants Willoughby and Quinn, acting individually and in concert, and within the scope of their employment with the NHPD, wrongfully and unconstitutionally coerced false confessions from Plaintiff, as set forth above, and thereby deprived Plaintiff of his clearly established constitutional right not to be compelled to be a witness against himself.

**98.**     These Defendants performed the above-described acts under color of state law,

intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No reasonable officer in 2006 or 2007 would have believed this conduct was lawful.

99.    The foregoing coerced confessions were utilized in Plaintiff's prosecution, and were a material factor in, and cause of, his conviction,

100.    The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Plaintiff's deprivation of liberty and other injuries because their conduct resulted in the wrongful arrest, prosecution, conviction, and incarceration of Plaintiff, as these Defendants knew, should have known and were recklessly indifferent in ignoring.

## COUNT III
### 42 USC § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

#### *Against Defendants Willoughby and Quinn*

101.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

102.    Defendants Willoughby and Quinn, acting individually and in concert, and within the scope of their employment with the NHPD, and with malice and knowing that probable cause did not exist to prosecute Plaintiff for the Fields murder, caused Plaintiff to be arrested, charged, and prosecuted for that murder, thereby violating Plaintiff's clearly established rights, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of prosecution absent probable cause.

103.    Specifically, as described in detail above, Defendants Willoughby and Quinn, acting

individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory facts that they knew vitiated probable cause against Plaintiff and they knew would have eviscerated the State's case, including but not limited to the fact that the supposedly inculpatory statements of Holmes, Wells-Jordan and Plaintiff were obtained by coercion, were completely false, and were fabricated by them; the fact that Willoughby and Quinn had fabricated police documents to falsely implicate Plaintiff and to line their own pockets by appropriating pubic funds; and the fact that there was overwhelming evidence in their possession that the true perpetrator of the Fields murder was not Plaintiff, but Larry Mabery, who had committed two similar murders in close proximity of time and place to the Fields murder, using the same murder weapon.

104.     These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No reasonable officer in 2006 or 2007 would have believed this conduct was lawful.

105.     Plaintiff is completely innocent of the murder of Mr. Fields.

106.     The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Plaintiff's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Plaintiff, and did so result.

<u>**COUNT IV**</u>
**42 USC § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Pretrial and Trial Proceedings by Facilitating and Using Fabricated Evidence, Withholding Material Exculpatory Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**

***Against Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro***

**107.**    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

**108.**    Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro, acting individually and in concert, and within the scope of their employment with the NHPD, deprived Plaintiff of his clearly established constitutional rights to due process of law and to fair pretrial and trial proceedings.

**109.**    Defendants Willoughby and Quinn deprived Plaintiff of his rights to due process and to fair pretrial and trial proceedings by fabricating inculpatory evidence and deliberately using coercion and other misconduct (as set forth above) to obtain inculpatory witness statements, including without limitation: fabricating the false inculpatory statements of Holmes, Wells-Jordan and Plaintiff, and fabricating police documents to falsely implicate Plaintiff and to line their own pockets by criminally misappropriating pubic funds, and concealing the same from Plaintiff.

**110.**    Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro deprived Plaintiff of his rights to due process and to fair pretrial and trial proceedings by withholding and/or failing to ensure preservation and disclosure of material exculpatory information, including information regarding Holmes' and Wells-Jordan's actual statements that they had no inculpatory information whatsoever implicating Plaintiff in the Fields murder, and Willoughby and Quinn's

33

coercion and fabrication of their false taped statements; information concerning the abusive and unconstitutional conduct utilized to procure the ultimately inculpatory statements; evidence of Willoughby and Quinn's fabrication of police documents falsely implicating Plaintiff in the murder and falsely claiming that there was informant evidence which they knew did not exist; and evidence of Larry Mabery's commission of two other murders in close proximity of time and place to the murder of Mr. Fields, using the same murder weapon.

111.    Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro deprived Plaintiff of his rights to due process and to fair pretrial and trial proceedings by failing to conduct or ensure the conduct of a constitutionally adequate investigation, including without limitation by failing to follow up and disclose evidence of the culpability of Larry Mabery and Richard Benson, not Plaintiff, for the Fields murder.

112.    Defendants Ortiz, Redding, Badger and Muro deprived Plaintiff of his rights to due process and to fair pretrial and trial proceedings by failing to adequately and timely investigate and disclose the criminal misconduct of Detectives Willoughby and Quinn, including their fabrication of police documents to misappropriate informant funds – including, among others, the fabrication of police documents in the Fields case to falsely implicate Plaintiff – and thereafter continuously failing to examine, rectify or disclose the related misconduct of said detectives in manufacturing the case against Plaintiff and similar misconduct in other New Haven murder investigations.

113.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No reasonable officer in 2006 and 2007 would have

believed this conduct was lawful.

**114.**    The acts and omissions by Defendants described in the preceding paragraphs were the

direct and proximate cause of Plaintiff's injuries because Defendants knew, or should have

known, that their conduct would result in the wrongful arrest, prosecution, conviction, and

incarceration of Plaintiff, and did so result.

**<u>COUNT V</u>**
**42  U.S.C. § 1983 Civil Rights Conspiracy**

***Against Defendants Willoughby and Quinn***

**115.**    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

**116.**    Defendants Willoughby and Quinn, acting within the scope of their employment and

under color of state law, agreed among themselves to act in concert in order to deprive Plaintiff

of his clearly established Fourth, Fifth and Fourteenth Amendment rights to be free from police-

fabricated evidence, coerced confessions, unreasonable searches and seizures, false arrest, false

imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and

to  the enjoyment of fair pretrial and trial proceedings.

**117.**    In furtherance of the conspiracy, these Defendants engaged in and facilitated numerous

overt acts, including, without limitation, the following:

     **a.**    Fabricating inculpatory evidence in reports and tapes of false and coerced witness

       statements;

     **b.**    Intentionally or with deliberate indifference failing to comply with their duty to

       disclose *Brady* material during the pendency of the case;

     **c.**    Fabricating police documents falsely reporting informant evidence implicating

35

Plaintiff that did not exist, and thereafter failing to disclose such misconduct;

**d.** Wrongfully arresting and causing the conviction and incarceration of Plaintiff, knowing that they lacked probable cause.

**e.** Failing to follow up or investigate the evidence of the true perpetrators of the Fields murder and of Plaintiff's innocence.

**f.** Thereafter suppressing and covering up evidence of their wrongdoing in all of the foregoing respects, while Plaintiff remained in prison for a crime they knew he did not commit.

**118.** The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Plaintiff's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Plaintiff, and did so result.

### COUNT VI
### 42 U.S.C. § 1983 Failure to Intercede

#### *Against Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro*

**119.** Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

**120.** By their conduct and under color of state law, Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro, acting within the scope of their employment with the NHPD, had opportunities to intercede with respect to Plaintiff to prevent and rectify his false arrest, coerced confessions, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

36

121.    Defendants' failures to intercede violated Plaintiff's clearly established constitutional right to be free from police-fabricated evidence, coerced confessions, unreasonable search and seizure, and malicious prosecution, and not to be deprived of liberty without due process of law as guaranteed by the Fourth, Fifth and Fourteenth Amendments.  No reasonable police officer in 2006 or 2007 would have believed that failing to intercede to prevent and rectify the foregoing violations was lawful.

122.    Defendants' acts and omissions in failing to intercede as aforesaid were the direct and proximate cause of Plaintiff's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and continued incarceration of Plaintiff, and did so result.

<u>**COUNT VII**</u>
**42 USC § 1983 Supervisory Liability Claim**

*Against Defendants Ortiz Redding, Badger and Muro*

123.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

124.    Defendants Willoughby and Quinn acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendants Ortiz, Redding, Badger and Muro, in this case and as a matter of practice.

125.    Defendants Ortiz, Redding, Badger and Muro acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of Plaintiff and other citizens by failing to provide adequate training, supervision, and discipline of Detectives Willoughby and Quinn, and thereby allowing these detectives to deprive Plaintiff of his clearly established constitutional rights, including his rights to be free from police-manufactured false evidence, coerced

37

confessions, suppression of exculpatory evidence, unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law.

126.    Had Defendants Ortiz, Redding, Badger and Muro not provided grossly inadequate training, supervision, and discipline of Willoughby and Quinn, those defendants would not have coerced and fabricated witness statements against Plaintiff, fabricated other inculpatory evidence, withheld exculpatory evidence, ignored and suppressed evidence of the true perpetrators, and caused Plaintiff to be arrested and prosecuted without probable cause.

127.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Ortiz, Redding, Badger and Muro under color of state law violated their clearly established duty to supervise Willoughby and Quinn, and no reasonable police supervisor in 2006 and 2007 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

128.    The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Plaintiff's injuries because these Defendants knew, or should have known, that their conduct would result in imminent harm to Plaintiff, i.e., his wrongful arrest, prosecution, conviction, and continued incarceration, and did so result.

<u>**COUNT VIII**</u>
**42 U.S.C. § 1983 Municipal Liability Claim**

*Against Defendant Ortiz, in his official capacity, and Defendant City of New Haven*

129.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

**Municipal liability based on Chief Ortiz's ratification of and/or deliberate indifference to Willoughby and Quinn's misconduct.**

130.    Defendant Ortiz served as the Chief of Police of the NHPD from before the Fields murder, until well after Plaintiff's wrongful conviction.

131.    As Chief of Police, Ortiz had ultimate decision-making authority with respect to the NHPD's personnel decisions (such as which officers and detectives were assigned to which unit and which cases), disciplinary issues (such as when to initiate an internal investigation into an allegation of misconduct), and investigative steps (such as whether to open or close particular investigation).

132.    Although Chief Ortiz was or should have been aware of the unconstitutional practices utilized by Willoughby and Quinn -- including the investigative misconduct and the unconstitutional coercion of witness statements and the failure to maintain, preserve or disclose exculpatory information concerning the circumstances surrounding the pre-tape procurement of such statements, and the fabrication of police documents falsely claiming there was informant evidence against Mr. Plaintiff that did not exist -- Ortiz chose not to investigate or make timely disclosure of such information, or to rectify and reopen cases tainted by such misconduct. In fact, Ortiz did absolutely nothing to question Willoughby and Quinn's investigation into the Fields murder and did nothing to review, supervise or reopen the Fields case even after knowledge of the fabrication of police documents in that very case.

**Municipal liability based on the NHPD's custom, pattern, or practice of unconstitutional investigative techniques.**

133.    Prior to and at the time of the unlawful interrogation, arrest, prosecution, and conviction of Plaintiff, NHPD officers and detectives, including Defendants Willoughby and Quinn,

maintained a custom, pattern, and practice of unconstitutional investigative techniques, including but not limited to the following:

a. use of coercive and/or suggestive techniques in interviews and interrogations to obtain witness statements that law enforcement knew or should have known were false and illegally obtained;

b. failure to document exculpatory information, including the systematic failure to record or make any record of the lengthy pre-tape interrogation sessions routinely misused by the NHPD to threaten witnesses and suspects and to feed them information for subsequent inclusion in taped statements that were falsely portrayed by the NHPD as supposedly unprompted;

c. the premium placed on rapid fire closure of New Haven murder investigations in a manner that rewarded quick closure over proper investigation;

d. suppression of evidence inconsistent with the culpability of a targeted suspect, once selected and/or arrested; and

e. refusal to re-examine or reopen major felony cases once closed, regardless of the exculpatory evidence presented.

134.    The policy, custom, pattern, or practice of unconstitutional investigative techniques by NHPD detectives and officers is reflected in the multiple acts of misconduct and illegality committed by Defendants Willoughby and Quinn and other NHPD detectives and supervisors in relation to multiple witnesses, both in Plaintiff's case and other cases as detailed above.

**Municipal Liability based on the NHPD's failure to supervise, discipline, and train its officers and detectives with respect to improper and unconstitutional acts.**

135.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of

Plaintiff, the NHPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately supervise, discipline, and train NHPD officers and detectives, including Detectives Willoughby and Quinn, with respect to engaging in unconstitutional actions, the failure to protect the rights of suspects and witnesses, the importance of precautions against wrongful arrests and convictions, and the proscription of improper investigative techniques, including but not limited to: manufacturing false evidence, fabricating false police documents, misuse of police informants; improper custodial interrogations and witness interviews; failing to preserve, document and disclose exculpatory and impeachment evidence; and failing to abide by the affirmative ongoing obligation to come forward with exonerating evidence.

136.    The NHPD's policy, custom, pattern, or practice of failing to adequately supervise, discipline, and train NHPD officers and detectives with regard to engaging in improper and unconstitutional actions is reflected in the numerous acts of misconduct and illegality committed by Defendants Willoughby and Quinn and other NHPD detectives and supervisors, both in Plaintiff's case and other cases.

137.    The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Plaintiff's injuries herein because these Defendants knew, or should have known, that their conduct would result in imminent and ongoing harm to Plaintiff, including his wrongful arrest, prosecution, conviction, and lengthy prison sentence for a crime he did not commit, and did so result.

## STATE LAW CLAIMS

### COUNT IX
**Malicious Prosecution, in Violation of Connecticut State Law**

#### *Against Defendants Willoughby and Quinn*

**138.**   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

**139.**   Defendants Willoughby and Quinn, acting individually and in concert and within the scope of their employment with the NHPD, with malice and knowing that probable cause did not exist to prosecute Plaintiff for the Fields murder, caused Plaintiff to be arrested, charged, and prosecuted for those murders, thereby violating Plaintiff's clearly established rights to be free of prosecution absent probable cause.

**140.**   Specifically, as described in detail above, Defendants Willoughby and Quinn, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory facts that they knew vitiated probable cause against Plaintiff, including but not limited to the fact that the supposedly inculpatory statements of Holmes, Wells-Jordan and Plaintiff were obtained by coercion, were completely false, and were fabricated; the fact that Willoughby and Quinn had fabricated police documents to falsely implicate Plaintiff and to line their own pockets by appropriating pubic funds; and the fact that Larry Mabery had committed two similar murders in close proximity of time and place to the Fields murder, using the same murder weapon.

**141.**   These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and away from Plaintiff.

**142.**   These Defendants performed the above-described acts intentionally, maliciously, with

reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established rights.  No reasonable officer in 2006 or 2007 would have believed this conduct was lawful.

**143.**     Plaintiff is completely innocent of the murders of Mr. Fields.

**144.**     The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Plaintiff's injuries herein because these Defendants knew, or should have known, that their conduct would result in his wrongful arrest, prosecution, conviction, and incarceration, and did so result.

<u>**COUNT X**</u>
**Abuse of Process, in Violation of Connecticut State Law**

*Against Defendants Willoughby and Quinn*

**145.**     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

**146.**     Defendants Willoughby and Quinn, acting individually and in concert with improper purpose and without legal justification, and within the scope of their employment with the NHPD, caused Plaintiff to be arrested, charged, and prosecuted for the Fields murder knowing that the evidence against him was false and fabricated.

**147.**     As described in detail above, after commencement of legal proceedings, Defendants Willoughby and Quinn intentionally withheld and misrepresented exculpatory facts that they knew vitiated probable cause against Plaintiff and they knew would have impeached witnesses for the prosecution, including but not limited to the fact that the supposedly inculpatory statements of Holmes, Wells-Jordan and Plaintiff were obtained by coercion, were completely false, and were fabricated; the fact that Willoughby and Quinn had fabricated police documents to falsely implicate Plaintiff and to line their own pockets by appropriating pubic funds; and the

fact that Larry Mabery had committed two similar murders in close proximity of time and place to the Fields murder, using the same murder weapon.

**148.**    Defendants had no legal justification or proper purpose for their actions.

**149.**    These Defendants performed the above-described acts under maliciously, intentionally, with reckless disregard for the truth, with deliberate indifference to Plaintiff' rights, and for purposes other than the legitimate prosecution of crime.  No reasonable officer in 2006 or 2007 would have believed this conduct was lawful.

**150.**    The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Plaintiff's injuries because these Defendants knew, or should have known, that their conduct would result in his wrongful prosecution, conviction, and incarceration, and did so result.

<u>**COUNT XII**</u>
**Intentional or Negligent Infliction of Emotional Distress,**
**in Violation of Connecticut State Law**

***Against Defendants Willoughby and Quinn***

**151.**    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

**152.**    Defendants Willoughby and Quinn, acting individually and in concert with improper purpose and without legal justification, and within the scope of their employment with the NHPD, caused Plaintiff to be arrested, charged, and prosecuted for the Fields murder knowing that the evidence against him was false and fabricated.

**153.**    The misconduct by these Defendants, as described throughout this Complaint, constituted fraudulent, dishonest, and corrupt means of obtaining the arrest, prosecution, conviction and

44

confinement of Plaintiff for a crime he did not commit.

154.    These acts and omissions were undertaken with malice, and resulted in the intentional and unlawful arrest, prosecution, conviction, restraint and confinement of. Plaintiff.

155.    These Defendants, acting within the scope of their employment and under color of state law, took these actions with the purpose of inflicting emotional distress upon Plaintiff, in order to coerce confessions and "clear" the Fields murder investigation. These Defendants knew or should have known that their actions would likely result in inflicting severe emotional distress on Plaintiff, and indeed sought to create and exploit such severe emotional distress for the very purpose of achieving their wrongful ends, and with reckless disregard for the extreme emotional distress that Plaintiff would suffer thereby.

156.    The conduct of these Defendants was extreme and outrageous, resulting in Plaintiff's sentence to 38 years and serving nine years imprisoned for a brutal crime with which he had nothing to do, cutting him off from his family, and irreparably depriving him of the crucial developmental years between age 16 and 25.

157.    Defendants' conduct was the direct and proximate cause of Plaintiff's extreme and severe emotional distress, including severe mental anguish, loss of hope, fear, likely prospect of incarceration for a substantial portion of his remining life, humiliation, indignities and embarrassment, and degradation and other damages as alleged herein.

## COUNT XII
### Negligence, in Violation of Connecticut State Law

### *Against Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro*

158.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

159.    Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro were police personnel acting within the scope of their employment and under color of law, who had a duty to Plaintiff, and citizens in general, to diligently, fairly, and accurately investigate crimes and arrest persons only when there was probable cause to do so. Defendants also had a duty to Plaintiff, and citizens in general, to protect them from the unlawful or grossly negligent conduct of other NHPD officers and detectives.

160.    Defendants, however, breached their duties by causing and allowing Plaintiff to be wrongfully arrested, charged, prosecuted, convicted, and incarcerated for the Fields murder, when they knew, or reasonably should have known, that the evidence against Plaintiff was fabricated and that there was no probable cause to believe he was guilty, and by thereafter continually failing to rectify said injustice.

161.    Defendants Willoughby and Quinn breached their duties to Plaintiff by coercing witnesses, fabricating evidence, intentionally withholding exculpatory evidence, failing to adequately and properly investigate the Fields murder, and lying about all of it.

162.    Defendants Ortiz, Redding, Badger and Muro breached their duties to Plaintiff by failing to properly protect Plaintiff from the unlawful or grossly negligent conduct of Quinn and Willoughby in coercing and fabricating evidence, failing to record or preserve exculpatory evidence, concealing exculpatory evidence, and failing to investigate or disclose evidence pointing to the actual perpetrators; by failing to timely investigate, disclose and rectify said misconduct; by failing to investigate, disclose or follow up on the additional evidence of Willoughby and Quinn's fabrication phony confidential informant "evidence" against Plaintiff, and the troubling corruption and lack of integrity reflected thereby; by allowing the Willoughby-

46

Quinn 100% team to hold free reign over the Fields investigation and Plaintiff's interrogation and arrest without question or supervision whatsoever; by failing to promulgate and institute practices and procedures to address the illegal practices in question; and by failing to thereafter review or reopen the case even after learning of those illegalities, or rectifying their devastating adverse impact on the rights, life and liberty of Plaintiff.

**163.** The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Plaintiff's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and continuing incarceration of Plaintiff over a long period of time.

<u>**COUNT XIII**</u>
**Violation of Article First, §§ 7 and 9 of Connecticut Constitution**

*Against Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro*

**164.** Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

**165.** Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro, acting individually and in concert, and within the scope of their employment with the NHPD, caused Plaintiff to be wrongfully arrested, charged, prosecuted, convicted, and continuously incarcerated for the Fields murder for nearly nine years, between the age of 16 and 25. Specifically, as described in detail above, Defendants Willoughby and Quinn coerced witnesses, fabricated evidence, intentionally withheld and misrepresented exculpatory facts that they knew vitiated probable cause against Plaintiff, and failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and away from Plaintiff.

**166.** Defendants Ortiz, Redding, Badger and Muro wrongfully failed to protect Plaintiff from

the unlawful conduct of Willoughby and Quinn.

167.    The intentional and/or recklessly indifferent misconduct of these Defendants, acting

within their employment and under color of state law, violated Plaintiff's clearly established

rights under the Seventh and Ninth Sections of Article First of the Constitution of the State of

Connecticut. No reasonable police officer would have believed that these acts were lawful or that

probable cause existed.

168.    Plaintiff is completely innocent of the murder of Mr. Fields.

169.    The acts and omissions by these Defendants described in the preceding paragraphs were

the direct and proximate cause of Plaintiff's injuries because these Defendants knew, or should

have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and

incarceration of Plaintiff.

**COUNT XIV**
**Indemnification under Conn. Gen. Stat. §7-465**

***Against the City of New Haven***

170.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows:

171.    As described in the preceding paragraphs and Counts, the Individual Defendants

Willoughby, Quinn, Ortiz, Redding, Badger and Muro were police personnel acting within the

scope of their employment and under color of law, who had a duty to Plaintiff, and citizens in

general, to diligently, fairly, and accurately investigate crimes and arrest persons only when there

was probable cause to do so, and to protect them from the unlawful or grossly negligent conduct

of other NHPD officers and detectives.  As discussed above, the Individual Defendants breached

48

these duties in a number of ways, thereby directly and proximately causing Plaintiff's wrongful arrest, prosecution, conviction, and incarceration.

172.    To the extent the Individual Defendants are determined to be liable to Plaintiff and are obligated to pay damages, the Defendant City of New Haven is liable to pay any such damages on behalf of the Individual Defendants pursuant to the City of New Haven's statutory liability imposed by Conn. Gen. Stat. §7-465.

<u>COUNT XV</u>
**Direct action under Conn. Gen. Stat. § 52-557n**

*Against the City of New Haven*

173.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

174.    The Individual Defendants Willoughby, Quinn, Ortiz, Redding, Badger and Muro were police personnel acting within the scope of their employment and under color of law, who had a duty to Plaintiff, and citizens in general, to diligently, fairly, and accurately investigate crimes and arrest persons only when there was probable cause to do so, and to protect them from the unlawful or grossly negligent conduct of other NHPD officers and detectives. As discussed above, the Individual Defendants breached these duties in a number of ways, thereby directly and proximately causing Plaintiff's wrongful arrest, prosecution, conviction, and incarceration.

175.    Pursuant to the City of New Haven's statutory liability imposed by Conn. Gen. Stat. § 52-557n, the City of New Haven is liable for the damages caused by the acts and omissions of these Individual Defendants.

**WHEREFORE**, Plaintiff prays as follows:

A.     That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B.     That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.     For a trial by jury;

D.     For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.     For any and all other relief to which Plaintiff may be entitled.


Dated: October 23, 2017                    Respectfully Submitted,
                                           THE PLAINTIFF: BOBBY JOHNSON

                                   By:    /s/ Kenneth Rosenthal
                                           Kenneth Rosenthal (ct05944)
                                           Law Office of Kenneth Rosenthal
                                           700 State Street
                                           New Haven, CT 06511
                                           (203) 915-4235
                                           krosenthal@gs-lawfirm.com

**CERTIFICATE OF SERVICE**

This is to certify that on October 26, 2017, a copy of the foregoing was filed

electronically (and served by mail on anyone unable to accept electronic filing).  Parties may

access this filing through the Court's system.


_s/Kenneth Rosenthal_   .                      __
        Kenneth Rosenthal